UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

JOHN DOE,                                                              :
                                                                       :    Civil Action No:
                              Plaintiff,                               :
                                                                       :
                                                                       :
                    -against-                                          :
                                                                       :
                                                                       :    **JURY TRIAL DEMANDED**
HOFSTRA UNIVERSITY;                                                    :
BOARD OF TRUSTEES OF HOFSTRA                                           :
UNIVERSITY; **LYNDA O'MALLEY**, individually                          :
and as agent for Hofstra University; **ROBERT K.**                    :
**MCDONALD**, individually and as agent for Hofstra                   :
University; **ALLISON G. VERNACE**, individually                      :
and as agent for Hofstra University; and **HEATHER**                  :
**A. DEPIERRO**, individually and as agent for Hofstra                :
University;                                                            :
                                                                       :
                              Defendants.                              :
---------------------------------------------------------------------X

## COMPLAINT

Plaintiff John Doe[1] ("Plaintiff" or "Doe"), by his attorneys, Nesenoff & Miltenberg, LLP,

as and for his Complaint against Defendants Hofstra University ("Hofstra" or "the University"),

Board of Trustees of Hofstra University ("Board"), Lynda O'Malley ("O'Malley"), Robert K.

McDonald ("McDonald"), Allison G. Vernace ("Vernace"), and Heather A. DePierro ("DePierro")

(collectively, "Defendants"), respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      This case arises out of the actions taken and policies and procedures employed by

Defendants in investigating and erroneously adjudicating a complaint of sexual misconduct filed

---

[1] Plaintiff has filed herewith a motion to proceed by pseudonym.

1

by Jane Roe,[2] a female undergraduate student at Hofstra, against Plaintiff John Doe, a male undergraduate student at Hofstra, along with the actions and inactions of Defendants in failing to adequately address Plaintiff's reported incidents of severe, racially-motivated harassment, including physical violence.

2.      Roe and Plaintiff, both freshmen at Hofstra during the time period relevant to this action, met at a new student orientation in the Summer of 2017 and quickly became friends.  A few weeks into their first semester, Roe invited Plaintiff to her dorm room, where the two began kissing on her bed.  Plaintiff laid back and Roe got on top of him, and the two continued kissing and caressing each other over their clothing.  During this encounter, Roe made a comment about the fact that she had a boyfriend and stated something to the effect of "this is wrong," or "we shouldn't", but she continued to kiss and engage with Plaintiff as she was on top of him.  At some point, Roe told Plaintiff they should stop, upon which Plaintiff immediately stopped kissing and touching Roe.  A short while later, Plaintiff had to leave for wrestling practice.  Roe walked with Plaintiff back to his dorm, where they parted ways with a hug.

3.      Five months later, on February 14, 2018, Plaintiff was summoned to Hofstra's Public Safety office via a text message from Defendant Lynda O'Malley, Hofstra's Assistant Director of Public Safety.  O'Malley insisted Plaintiff come to Public Safety immediately and refused to disclose the reason for the meeting.  At the meeting, Plaintiff was interrogated about the incident with Roe in September of 2017, though he was not informed of any specific allegations Roe had made against him.  Plaintiff was denied the right to speak to an advisor despite his express request for one.  At the meeting, Public Safety officers attempted to cajole Plaintiff into submitting

---

[2] Jane Roe is a pseudonym.

a written statement about what happened with Roe in September 2017, before speaking to an advisor.

4.      Approximately two weeks later, Hofstra informed Plaintiff that it had completed a Title IX investigation into the September 2017 incident.  Plaintiff had yet to be apprised of the initiation of a Title IX investigation, let alone the specific allegations against him or the potential charges or sanctions he faced.

5.      After the close of the investigation, Plaintiff was issued a formal Notice of Charges (Notice), informing Plaintiff for the first time that he was being charged with two counts Sexual Assault in violation of Hofstra's Student Policy Prohibiting Discriminatory Harassment, Relationship Violence and Sexual Misconduct ("the Policy").  Specifically, Plaintiff was charged with Non-Consensual Sexual Intercourse and Non-Consensual Sexual Contact, for allegedly fondling Roe's buttocks and digitally penetrating her vagina without her consent.

6.      As Plaintiff would later discover, Hofstra's Title IX "investigation" was little more than a sham proceeding wherein Roe submitted a one-paragraph written statement accusing Plaintiff of sexual assault and was never substantively interviewed or questioned regarding her allegations.  Essentially, as soon as a female student made an accusation of sexual misconduct against a male student, the male student was presumed guilty and Hofstra undertook no effort whatsoever to actually investigate the claims or seek the truth.

7.      After a disciplinary hearing in April 2018, Plaintiff was found responsible for both counts of Sexual Assault in violation of the Policy and issued the egregiously disproportionate sanction of a two-year suspension.  Neither the initial notice of finding letter nor the sanction letter gave any rationale or explanation as to how Plaintiff was determined to be responsible, nor how the sanction was selected.  Plaintiff appealed both the finding and sanction, and both appeals were

summarily denied.  This lawsuit represents Plaintiff's last and only recourse to clear his name and right the wrongs occasioned by Defendants' callous, biased, improper, and unlawful conduct.

8.      Hofstra's decision finding Plaintiff responsible for Sexual Assault and the concomitant issuance of a <u>two-year suspension</u>, all because Plaintiff failed to understand Roe's initial vague and ambivalent statement about having a boyfriend, is a preposterous outcome and an unduly harsh sanction.  The instant that Roe clearly indicated to Plaintiff that she wanted to stop, he did stop.  Plainly, Plaintiff did not pose any threat to Roe or the campus community.

9.      Moreover, as a result of Roe's false allegations against Plaintiff, Plaintiff was subjected to severe and extreme harassment, creating a hostile learning environment, including stalking, threats, racially-discriminatory conduct, and physical violence.  When Plaintiff reported this harassment and abuse to Hofstra—and even included supporting documentary evidence—his concerns were summarily disregarded, and Hofstra deliberately refused to take any significant remedial action.

10.     Hofstra's disciplinary process in the instant case was replete with errors, including but not limited to Defendants': (i) failure to provide Plaintiff with timely notice of the charges against him and the potential sanctions for such charges; (ii) failure to conduct a fair, thorough, and impartial investigation; (iii) failure to properly address Plaintiff's well-documented reports of discrimination, harassment, stalking, and abuse; (iv) failure to properly apply the preponderance of the evidence as the burden of proof; (v) failure to adhere to Hofstra's own Policy; and (vi) abuse of discretion in the issuance of an unduly harsh and unwarranted sanction.

11.     On information and belief, Hofstra was determined to find Plaintiff guilty as the male accused, regardless of the facts of the case, as the result of immense pressure both externally and internally: At the end of January 2018—just weeks before Plaintiff was summoned to

4

Defendant O'Malley's office—the U.S. Department of Education's Office for Civil Rights ("OCR") had just completed a nearly year-long investigation into Hofstra for allegedly failing to sufficiently respond to sexual misconduct on campus.  On information and belief, this was OCR's third such investigation at Hofstra.  In addition, Hofstra had been heavily criticized by its student body in the years leading up to and encompassing this case, for failing to properly address sexual misconduct, and specifically, for Public Safety's allegedly poor treatment of assault victims and Hofstra's failure to punish male students and faculty accused of assault and harassment.

12.     Under the threat of the loss of federal funding, and in the face of years of criticism for its seemingly lax response to reports of sexual misconduct, Hofstra decided to make an example out of Plaintiff, regardless of the truth, motivated by his gender.

13.     Throughout the disciplinary process, Plaintiff was presumed guilty from the start and subjected to gender-biased unfair treatment leading to an erroneous outcome.  By way of example, and not limitation: (i) Defendants failed to provide Plaintiff with proper and adequate notice of the charges against him; (ii) Defendants deliberately refused to honor Plaintiff's right to have an advisor at his Public Safety meeting; (iii) Defendants presumed Roe to be credible as the female complainant and did not even bother to conduct a genuine investigation; (iv) Defendants ignored any inconsistencies in Roe's testimony and any inconsistency between Roe and her witness; (v) Defendants failed to afford Plaintiff the requisite presumption of innocence required by a preponderance of the evidence standard; (vi) Defendants imposed a wildly disproportionate and unjustified sanction, plainly oriented toward proving Hofstra's dedication to supporting female assault victims, rather than tailoring the sanction to the facts of the case; (vii) Defendants made findings of responsibility, imposed sanctions, and summarily dismissed Plaintiff's appeals without ever providing a sufficient explanation or rationale as to these decisions; and (viii) Defendants

deliberately and repeatedly ignored Plaintiff's well-documented claims of racially discriminatory harassment, threats, and assault.

14.     As detailed further below, Defendants engaged in a flawed process causing an erroneous outcome motivated by Plaintiff's gender, in violation of Title IX of the Education Amendments of 1972.

15.     As detailed further below, Defendants were deliberately indifferent to Plaintiff's reports of racial discrimination and stalking, threats, and physical assault, which was sufficiently severe and pervasive to cause a hostile learning environment and disrupt Plaintiff's educational experience at Hofstra, in violation of Title VI of the Civil Rights Act of 1964 and New York State Human Rights Law § 296(4).

16.     As detailed further below, Defendants' actions and inactions with respect to the Title IX disciplinary process violated Hofstra's own Policy, as well as New York Education Law Article 129-B.

17.     By violating their own Policy and depriving Plaintiff of a fair and impartial disciplinary process, Defendants breached express and implied agreements with Plaintiff and acted in bad faith in fulfilling their promises to him as an enrolled student paying tuition at Hofstra.

18.     By violating their own Policy and refusing to address Plaintiff's repeated reports of stalking, racial discrimination, harassment, threats, and assault, Defendants breached express and implied agreements with Plaintiff and acted in bad faith in fulfilling their promises to him as an enrolled student paying tuition at Hofstra.

19.     By failing to abide by the standards set forth in New York Education Law Article 129-B, Defendants breached a duty of care to Plaintiff, which resulted in damages, including the wrongful deprivation of his education and damage to his future education and career prospects.

20.     As a result of Defendants' discriminatory, unlawful, and negligent conduct, Plaintiff has sustained damages, including but not limited to emotional distress, mental anguish, damage to his future education and career prospects, and loss of his tuition payments.

21.     Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief for violation of Title IX of the Education Amendments of 1972, Title VI of the Civil Rights Act of 1964, New York Human Rights Law § 296(4), New York Civil Rights Law § 40–c(2), breach of contract, promissory estoppel, and negligence.

## THE PARTIES

22.     Plaintiff John Doe is a natural person and a resident of Indiana.  At all relevant times herein, Plaintiff was an undergraduate student at Hofstra University.  Plaintiff matriculated to Hofstra in the Fall of 2017 with an expected graduation date of May 2021.

23.     Hofstra University is a partially federally funded, non-profit, nonsectarian university in Hempstead, New York, with an undergraduate enrollment of approximately 6800 students.

24.     The Board of Trustees of Hofstra University is the governing body of the University and has the sole responsibility for the management of the affairs of the University.  The Board is comprised of no fewer than five and no more than thirty persons, plus up to ten former chairpersons.  The Board of Trustees operates in accordance with the Hofstra University corporate bylaws, which are governed by the laws of the state of New York.

25.     Lynda O'Malley is a natural person and, at all relevant times herein, was the Assistant Director of Public Safety at Hofstra University.  On information and belief, O'Malley is a resident of New York.

26.     Robert K. McDonald is a natural person and, at all relevant times herein, was the Associate Director of Operations in Hofstra's Public Safety office.  On information and belief, McDonald is a resident of New York.

27.     Allison G. Vernace is a natural person and, at all relevant times herein, was the Title IX Officer for Student Issues at Hofstra.  On information and belief, Vernace is a resident of New York.

28.     Heather A. DePierro is a natural person and, at all relevant times herein, was the Assistant Dean of Students and Director of Community Standards at Hofstra.  On information and belief, DePierro is a resident of New York.

## JURISDICTION AND VENUE

29.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the Plaintiff and Defendants are residents of different states and the amount in controversy exceeds $75,000.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the laws of the United States, specifically, under Title IX of the Education Amendments of 1972 and Title VI of the Civil Rights Act of 1964.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

30.     This Court has personal jurisdiction over Defendants Hofstra, O'Malley, McDonald, Vernace, and DePierro on the grounds that these Defendants resided and/or conducted business within the state of New York during the relevant time period.

31.     This Court has personal jurisdiction over the Board of Trustees on the grounds that the Board is organized under the laws of the state of New York.

32.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because the acts or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.  BACKGROUND: HOFSTRA FACES PRESSURE TO AGGRESSIVELY PURSUE SEXUAL ASSAULT CLAIMS.

#### A.  The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities by Threatening to Withhold Federal Funding.

33.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

34.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

35.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, National Public Radio (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that

women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

36.     The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study, and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist, *Setting the Record Straight on "1 in 5"*, Time Magazine (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

37.     Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.

38.     The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" and focus on victim advocacy.  For example, it stated that schools should give both parties the right to appeal a decision – in other words, if an accused student was found not responsible, the complainant could then appeal and force the respondent to defend the charges all over again, functionally constituting double-jeopardy.

39.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

40.     On April 19, 2014, the OCR issued additional directives to colleges and universities

10

in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "2014 Q&A").

41.     Like the DCL, the 2014 Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."  The 2014 Q&A advised schools to adopt a "trauma-informed" approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." 2014 Q&A at 31.  The Q&A further advised that, although "the rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights . . . a school should ensure that any due process rights do not restrict or unnecessarily delay the protections provided by Title IX <u>to the complainant</u>."  2014 Q&A at 13 (emphasis added).

42.     In the same month that the OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), available at https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.   The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

43.     In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance

with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.

44.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted <u>over five hundred</u> investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited Dec. 18, 2018).

45.     The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges, including Hofstra, to aggressively pursue and punish male students accused of sexual misconduct.  In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed: "There is a certain hysteria in the air on this topic, . . . .  It's really a surreal situation, I think." *See* Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*," National Public Radio (Aug. 12, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention.  Neal explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."

46.     Robert Dana, Dean of Students at the University of Maine, echoed the sentiment that a fear of governmental intervention and withdrawal of funds could lead colleges to rush to judgment against male students in disciplinary proceedings.  *See* Tovia Smith, *Some Accused of Sexual Assault on Campus Say System Works Against Them*, National Public Radio (Sept. 3, 2014), https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them.  Dana told NPR, "[c]olleges and universities are getting very jittery about it." *Id.*

47.     Likewise, on September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal government," including claims that college campuses had become "hazardous places" for female students.  *See* Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, Chronicle of Higher Education (Sept. 1, 2014), https://www.chronicle.com/article/Presumed-Guilty/148529.  For example, the article noted that different standards were being applied to male students versus female students: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no.  That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." *Id.*

48.     Notably, a recent study by the National Bureau of Economic Research found that opening more Title IX investigations benefits colleges in their application submission rates, and has no negative impact on securing donations. The study found "no evidence [that] federal Title IX investigations reduce students' interest in a university.  Instead, [it found] evidence that these investigations increase freshman applications and enrollment, for both female and male students." *See* Jason M. Lindo et al., *Any Press is Good Press? The Unanticipated Effect of Title IX Investigations on University Outcomes*, National Bureau of Economic Research, Working Paper No. 24852 (July 2018), http://www.nber.org/papers/w24852.  The study further found that "[f]ederal Title IX investigations appear to have no effect on student retention, as the enrollment of continuing students is unaffected," and that "analysis of . . . data suggests that federal Title IX investigations have no detectable effects on donations." *Ibid.*  In other words, colleges and universities have everything to gain from aggressively pursuing Title IX cases, and nothing to lose.

13

49.     On September 22, 2017, the OCR rescinded the DCL and put in place interim guidance (the "2017 Q&A"), while the current administration reviews and revises its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed*., Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

50.     As Secretary of Education, Betsy DeVos, noted, the rescission of the DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims."  Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

51.     As one college administrator observed shortly thereafter, "I think that [DeVos's] reference to due process is because of her overall assessment that the pendulum has swung too far in favor of complainants as a result of the directives in the Dear Colleague Letter."  Sarah Asch, *Federal Changes to Title IX on Sexual Assault Could Impact Middlebury*, The Middlebury Campus (Sept. 20, 2017), https://middleburycampus.com/36090/features/federal-changes-to-title-ix-on-sexual-assault-could-impact-middlebury/.

52.     The 2017 Q&A, in a significant departure from the 2011 DCL, permits colleges to utilize a higher burden of proof than "preponderance of the evidence" when adjudicating sexual misconduct; it also emphasizes the need for equal rights under Title IX proceedings, mandating that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms."  2017 Q&A at 4.

53.     The 2017 Q&A suggests that the policies and procedures in place at Hofstra at all times relevant to this lawsuit – which, on information and belief, were tailored in such a way as to comply with the 2011 DCL under threat of loss of federal funding – were unfair and, ultimately, out of step with the goal of gender equality in Title IX proceedings.  Moreover, to the extent these policies did purport to provide a fair process to respondents, Defendants failed to honor them.

**B.  OCR Conducts Multiple Investigations into Hofstra's Handling of Sexual Assault and Harassment Claims.**

54.     The threat of loss of federal funds due to a Title IX investigation was not a baseless fear for Hofstra; to the contrary, public records indicate Hofstra had been investigated by OCR numerous times for its allegedly inadequate handling of sexual harassment and assault claims in the decade leading up to Roe's complaint in this case.

55.     In January 2009, a female student at Hofstra filed a complaint with OCR alleging the University failed to adequately respond to her reports of sexual harassment by other students. That investigation closed in July 2009.

56.     In May 2015, The Huffington Post reported that Hofstra University was again under OCR investigation for its handling of claims of sexual harassment.  *See* Tyler Kingkade, *A Number Of Colleges Are Under Scrutiny For Sexual Harassment, But You Wouldn't Know It*, The Huffington Post (May 19, 2015), https://www.huffingtonpost.com/2015/05/19/colleges-sexual-harassment_n_7309444.html (last updated June 3, 2015).   On information and belief, that investigation opened in July 2014 and went on for over a year, closing in September 2015.   On information and belief, the complainant in that case was a female student alleging wrongdoing by a male student.

57.     On information and belief, in March 2017, OCR opened its third investigation into Hofstra for its alleged mishandling of sexual harassment and sexual assault claims by female

students, as well as insufficient grievance procedures and insufficient dissemination of its policies. On information and belief, that investigation closed in January 2018, just weeks before Roe filed her complaint against Plaintiff.

### C. **Hofstra Faces Student Criticism for Insufficiently Responding to Sexual Assault and Harassment Claims.**

58.     In 2015, while Hofstra was under its second OCR investigation, Hofstra unveiled a new initiative called "It's On Us," mirroring an identically-named campaign initiated by the White House, which was aimed at raising awareness surrounding sexual assault.  However, after its on-campus launch, the program was panned in an editorial published in Hofstra's school newspaper, The Hofstra Chronicle, wherein the author opined that the entire affair was little more than a public relations stunt and a waste of University resources.  *See* Julie Rafatpanah, *It's On Us Fails to Discuss Sexual Assault*, The Hofstra Chronicle (Mar. 2, 2015), https://www.thehofstrachronicle.com/archive-2015/its-on-us-fails-to-discuss-sexual-assault?rq=sexual%20assault.

59.     In the article, the writer lamented that Hofstra's initiative lacked any real substance and appeared to be more of a marketing campaign: "It's On Us T-shirts and hoodies were given out in an effort to raise 'awareness' of sexual assault on campus. . . .  Although It's On Us is meant to be a community movement, it felt much more like a public relations event put on by the Hofstra administration.  The reason the It's On Us campaign is appealing is the same reason that it is ineffective; it doesn't directly deal with the issue of sexual assault."  *Id.*  The author continued, "The Hofstra It's On Us video ironically states, 'it's on us to have the difficult conversations.' Apparently, according to Hofstra, handing out piles of shirts and posing with 'It's On Us' signs is as difficult of a conversation as we are able to have."  *Id.*

16

60.     In response to the editorial, a member of Hofstra's Its On Us programming committee submitted a letter to the editor defending the launch, stating that "[t]he students, faculty and staff of Hofstra University all want the same thing – to effectively, and hopefully one day permanently, put an end to sexual assault of all kinds, <u>by whatever means necessary</u>."  *See* Jackie Bakewell, *Letter to the Editor: In Response to "It's On Us fails to discuss sexual assault,"* The Hofstra Chronicle (Mar. 10, 2015), https://www.thehofstrachronicle.com/archive-2015/letter-to-the-editor-in-response-to-its-on-us-fails-to-discuss-sexual-assault?rq=sexual%20assault (emphasis added).

61.     In November 2015, just two months after OCR concluded its second investigation at Hofstra, the University launched its very first "Week of Action," created by the University's It's On Us committee.  *See* Emily Hassett, *It's On Us Committee Initiative Seeks Student Action*, The Hofstra Chronicle (Dec. 7, 2015), https://www.thehofstrachronicle.com/archive-2015/its-on-us-committee-iniative-seeks-student-action?rq=sexual%20assault.   The Week of Action included "speakers, conferences, film screenings and workshops for students," including a lecture by Anthony Zenkus, director of education for The Safe Center Long Island, an organization created through the merger of the Nassau County Coalition Against Domestic Violence and the Coalition Against Child Abuse & Neglect.  According to the Hofstra Chronicle, "The It's On Us Week of Action [was] aimed specifically at raising a higher level of awareness on college campuses over the course of one week to advocate for survivors of sexual assault."  *Id.*

62.     Hofstra's very public ramping up of its sexual assault awareness efforts, coinciding with its second OCR investigation for failing to adequately address sexual misconduct claims, evidences the pressure Hofstra felt from both students and the federal government to better address claims of sexual misconduct and to ensure that accused students faced punishment.

63.     In 2017, in response to Secretary of Education Devos's public statements regarding the need to revamp Title IX to ensure due process to the accused, The Hofstra Chronicle published an op-ed excoriating Devos' comments and declaring the concern over due process to be a "thinly-veiled attempt at erasing the progress" of the prior presidential administration.  *See* Delilah Gray, *Opinion: DeVos Defends Assault Deniers*, The Hofstra Chronicle (Sept. 11, 2017), https://www.thehofstrachronicle.com/archive-2017/opinion-devos-defends-assault-deniers?rq=sexual%20assault.

64.     The author of the article opined, "[DeVos] continues to meet with family members of those accused of sexual assault and advocates for a system that makes speaking out harder for victims, which proves which side she's fighting for."  *Id.*  She continued, "I find the blatant disregard to be not only offensive, but incredibly demeaning to sexual assault survivors. The best way to approach Title IX is to move forward by encouraging people to speak out about assault and improving investigational procedures."  *Id.*

65.     A few months later, The Hofstra Chronicle published a letter to the editor addressing "institutional misogyny," criticizing the University's perceived reluctance to hold male students and/or faculty members accountable for alleged sexual misconduct and what the author perceived to be ineffective and insincere Title IX training for students.  *See Letter to the Editor: Hofstra's Title IX Policies Are Asinine*, The Hofstra Chronicle (Nov. 7, 2017), https://www.thehofstrachronicle.com/archive-2017/letter-editor-hofstras-title-ix-policies-asinine.

66.     The author of the letter recalled, "I spoke to a member of the Student Government Association (SGA) about the [Title IX] training session I attended and about Title IX in general and it appears to be little more than a deterrent.  The SGA representative told me they personally

know someone who was sexually assaulted more than a year ago by a member of the Hofstra community and they still have class with this individual; the investigation is pending."  *Id.*

67.   The author continued, "the Title IX statutes at Hofstra and the law at large are an uphill battle for the victim.  If you want to report a case of sexual assault you have to call Public Safety who recently received public chastisement in The Chronicle for their inefficiency…"  *Id.*  The author concluded that, for victims of sexual assault, "[y]ou can go through the Title IX office and hope that if you complain they'll do something about it.  I tend to think this is a fruitless attempt."  *Id.*

68.   On November 9, 2017, The Hofstra Chronicle published an op-ed piece praising the increased number of women speaking out against sexual assault since the inception of the "Me Too" movement.  *See* Delilah Gray, *Opinion: The Weinstein Effect: Why Women Are Speaking Out* (Nov. 9, 2017), https://www.thehofstrachronicle.com/archive-2017/opinion-weinstein-effect-women-speaking?rq=sexual%20assault.   The piece focused on female victim advocacy specifically, and noted that "[t]he time where people would throw around the phrase, '[b]oys will be boys' is coming to an end.  Boys, like everyone else, will be held accountable for their actions." *Id.* (emphasis added).

69.   On information and belief, in April 2018—the same month Plaintiff had his Title IX hearing in this matter—Hofstra put on its first-ever Sexual Assault Awareness Month (SAAM).

70.   On information and belief, the first nationally-recognized Sexual Assault Awareness Month was in April 2000, as the result of a long-running campaign by the National Coalition Against Sexual Assault and the National Sexual Violence Resource Center.  The theme of the 2018 SAAM, as promoted by Hofstra, was "embrace your voice."

71.     Throughout the month, Hofstra held numerous activities on campus in support of sexual assault survivors and focusing on awareness and prevention.  Notably, the first of these events was about the "Start by Believing" campaign.  According to a description of the event promoted by Hofstra, "[i]n the wake of the #MeToo movement, many people have asked what they can do to support survivors.  For Sexual Violence Awareness Month, the Safe Center LI is asking that we #StartByBelieving.  Through this social media campaign, we will be asking students to take the pledge and share why they think it is important to believe survivors of sexual violence."

72.     As part of its SAAM activities, Hofstra's It's On Us committee also spent a week tabling in the Student Center with blank quilt squares that students could use to write messages of support for survivors of sexual assault.  The squares would then be sewn together into a quilt and put on display on campus.  At the time, Defendant Vernace told the Hofstra Chronicle, "[t]he quilt provides a public healing space and also shows the impact of sexual violence in our communities." *See* Nicole Boucher, *Monument Quilt Honors Survivors*, The Hofstra Chronicle (Apr. 17, 2018), https://www.thehofstrachronicle.com/category/news/2018/4/17/monument-quilt-honors-survivors?rq=sexual%20assault.

73.     In the same article, Vernace praised the It's On Us committee, noting it "has helped to bring proactive educational programming around sexual misconduct and intimate partner violence."  *Id.*

74.     In early May 2018, around the same time that Hofstra was deciding Plaintiff's fate in the Title IX matter, The Hofstra Chronicle published an editorial proclaiming that Bill Cosby's recent convictions for sexual assault were a cause "to rejoice for sexual assault victims everywhere."  *See* Delilah Gray, *Bill Cosby's Conviction Represents Progress*, The Hofstra Chronicle (May 8, 2015), https://www.thehofstrachronicle.com/category/editorials/2018/5/8/bill-

cosbys-conviction-represents-progress?rq=sexual%20assault.  The article continued, "[t]he norm right now, sadly, is that many cases don't even go to court. Two out of three cases go unreported. A study by RAINN shows 994 out of 1000 perpetrators will walk free. The reason this trial is so important is because for once, a man of power is getting punished." *Id.* Again, the article focused specifically on holding <u>men</u> accountable for sexual misconduct.

75.     Around the same time, Hofstra approved the creation of a new student-led Title IX advisory board.  The purpose of the student board was to work with school administrators "to make sure that the policies of Title IX are as transparent as possible and ensur[e] that students feel comfortable with and are aware of resources that are available." *See* Melanie Haid, *Student Board Approved to Work Alongside Title IX, The Hofstra Chronicle* (May 8, 2018), https://www.thehofstrachronicle.com/category/news/2018/5/8/student-board-approved-to-work-alongside-title-ix.  A Hofstra student asked to comment for the article responded positively to the creation of the board, noting, "I think that while most professors have a good sense of right and wrong in these sorts of cases, there is nothing like a college student's empathy for another college student." *Id.*

76.     In September 2018, The Hofstra Chronicle published another article echoing the sentiments of the aforementioned November 2017 editorial piece: that Hofstra was not sufficiently responding to allegations of sexual assault, and that Public Safety specifically was insufficiently attentive to victims' needs and sensitivities.  *See* Carissa Ramirez, *Still a Long Way to Go For Title IX at Hofstra*, The Hofstra Chronicle (Sept. 17, 2018), https://www.thehofstrachronicle.com/category/editorials/2018/9/17/still-a-long-way-to-go-for-title-ix-at-hofstra.

77.     The article opens with this bleak assessment of Title IX procedures at Hofstra: "It's fairly common knowledge among students on Hofstra's campus that Title IX reports are not always taken seriously and that Hofstra's culture around sexual misconduct in general needs improvement."   The article went on to accuse Public Safety of "victim-blaming" reporting students, and argued that "[s]tudents who have been victim-blamed in the past find their claims to be denied and invalidated by administrators, likely because if the claims were to be taken seriously, that would serve as proof that Hofstra University broke state educational law. Rather than improving students', specifically survivors', experiences, Hofstra would rather save itself the potential legal troubles and not address inappropriate and, frankly, illegal behaviors."

78.     In response to this article, Defendant Vernace and Denise Cunningham, Hofstra's Title IX officer for employee conduct, then submitted their own editorial, reassuring students that Hofstra is dedicated to enforcing Title IX and supporting victims of sexual assault.  *See* Allison Vernace & Denise Cunningham, *Re: Title IX*, The Hofstra Chronicle (Oct. 1, 2018), available at https://www.thehofstrachronicle.com/category/editorials/2018/10/1/re-title-ix.   In the article, the Title IX coordinators praised the new student Title IX board and noted the board had already effected a policy change: increasing the time for students to report misconduct from six months to one year.

79.     In light of Hofstra's lengthy history of OCR investigations, the constant criticism from its students that it does not sufficiently respond to reports of sexual assault or punish respondents, and Hofstra's very vocal, very active efforts to ensure its students that it is dedicated to addressing sexual assault claims, Plaintiff was doomed to be found responsible as soon as he was accused, regardless of the facts of the case.

### D. **Hofstra's History, Pattern, and Practice of Discrimination and Double-Standards.**

80.     Plaintiff is not the first male student at Hofstra to be falsely accused and railroaded by Hofstra's Public Safety office –specifically, Defendant McDonald.

81.     In April 2018, the New York Supreme Court vacated a Title IX finding and sanction imposed by Hofstra's Title IX office against a male respondent, finding Hofstra prevented the male respondent from properly preparing for his case, and unevenly, unfairly applied its policies; specifically, that it failed to respond to numerous policy violations by the female complainant, while finding the male respondent responsible for violations for which there was no credible evidence in the record. *See Hall v. Hofstra Univ.*, 59 Misc. 3d 1214(A) (N.Y. Sup. Ct. 2018).

82.     The court ordered the finding and sanction to be dismissed, noting that Hofstra failed to "exercise . . . honest discretion after a full review of the operative facts," and that Hofstra's attempts to procedurally hobble respondent's defense of his case were "troubling." *Ibid.*

83.     The *Hall* case demonstrates a disturbing pattern of facts similar to the instant case, including: The Public Safety Office's unilateral communications with potential complainants to encourage them to file formal complaints, where they had previously declined to do so; MacDonald's patent failure to investigate exculpatory evidence (which he defended in the *Hall* case as "not [his] role"); Hofstra's failure to investigate/punish the female complainant despite evidence of her policy violations; Hofstra's failure to honestly and impartially evaluate the evidence in the case; and Hofstra's failure to provide a procedurally fair and adequate opportunity for the male respondent to defend himself. *See id.*

84.     On information and belief, Hofstra's Public Safety Office has no uniform policy on note-taking during interviews, permitting abuse and uneven investigatory tactics.

85.     On information and belief, including the record in the *Hall* case, Defendant MacDonald routinely, systematically, and intentionally conforms his note-taking practices to whatever will benefit the female complainant—in other words, if a witness gives statements beneficial to the respondent, he will either discard the notes or not reduce the conversation to writing.

86.     On information and belief, Hofstra's Public Safety officers, specifically MacDonald, routinely, deliberately fail to investigate any leads or witnesses that could benefit or exculpate male respondents, and likewise, fail to adequately investigate witnesses or issues that could call into question the female complainant's narrative or credibility.

87.     On information and belief, Hofstra's Public Safety Office and Title IX office routinely ignore and refuse to prosecute policy violations by female complainants against male respondents.

88.     On information and belief, Hofstra's Public Safety Officers offer guidance and assistance to female complainants on how to write their complaints.

89.     Taken altogether, the facts of the *Hall* case and the parallels to the instant case show that Hofstra routinely, habitually, and as a matter or pattern and practice skews its Title IX procedures and conclusions in favor of female complainants and against male respondents.

## II.  HOFSTRA PROSECUTES PLAINTIFF AND REFUSES TO INVESTIGATE ROE.

### A.  <u>Plaintiff and Jane Roe.</u>

90.     Plaintiff and Roe first met at a new student orientation at Hofstra in July 2017, and quickly became friends.  Once school began in August 2017, Plaintiff and Roe would speak regularly, hang out almost daily, go to parties together, and even did laundry together on one occasion.

91.     On the afternoon of September 16, 2017—just a few weeks into their first semester at Hofstra—Roe and Plaintiff were chatting in the Student Center.  Roe asked Plaintiff if he wanted to go to her dorm room, and he agreed.  They entered Roe's building around 2:15 p.m.  In Roe's room, the two sat on Roe's bed and began kissing.  Plaintiff laid back on the bed, and Roe got on top of him.  The two continued kissing and began caressing each other over their clothing.

92.     At one point during the encounter, Roe told Plaintiff that she had a boyfriend, and, on information and belief, said something along the lines of, "this is wrong."  However, Roe continued to kiss and touch Plaintiff as she said so, and she remained on top of Plaintiff.  Because of her position, if Roe did not want to engage with Plaintiff at any point, all she had to do was sit up; she was in complete physical control of their encounter at all times.

93.     After a little while of kissing and touching each other over their clothing, Roe told Plaintiff they should stop because of her boyfriend.  Plaintiff immediately stopped kissing Roe.  Roe then got up off of Plaintiff, and Plaintiff sat up.  The two chatted for a few minutes, and Plaintiff told Roe he had to leave soon for wrestling practice.  Roe told Plaintiff she would come with him.  At around 3:30 p.m., the two left Roe's building and walked to Plaintiff's dorm together, where the two parted ways amicably.

94.     Approximately two days later, a "friend" of Roe's began stalking and harassing Plaintiff on social media.  On information and belief, the friend found Plaintiff's public Instagram profile, and began messaging numerous people who appeared in pictures with Plaintiff, demanding Plaintiff's cell phone number.  At one point, the friend messaged Plaintiff directly, insisting that Plaintiff provide his cell phone number, as the friend needed to "ask [Plaintiff] something important, urgent in fact."  When Plaintiff asked the friend what he wanted, the friend refused to

put anything in writing on the social media platform, insisting they speak over the phone instead. Plaintiff eventually relented, giving the friend his phone number.

95.     The friend then called Plaintiff on his cell phone and told Plaintiff, in an accusatory tone, "you know [Roe] has a boyfriend, right?" The friend then told Plaintiff in no uncertain terms that if Plaintiff ever spoke to Roe again, the friend would get a group of people together and they would "beat [Plaintiff's] ass."

96.     Later that day, Roe acknowledged that her friend had stalked, harassed, and threatened Plaintiff, apologizing to Plaintiff for the friend's threats and assuring Plaintiff that "everything [was] fine" and Plaintiff had nothing to worry about.  Plaintiff took Roe at her word, but the two did not socialize after that.

97.     Several weeks later, Plaintiff, who is part African-American and part Puerto-Rican, went to a Hofstra fraternity party with some friends.  As they attempted to enter the party, Plaintiff was stopped at the door by another Hofstra student, who told Plaintiff that his picture had been distributed among the fraternity and that Plaintiff was not to be admitted.  On information and belief, the photo was distributed and Plaintiff was banned from the fraternity by a friend of Roe's, after Roe falsely indicated to that student that Plaintiff had raped her.

98.     As Plaintiff walked away from the party towards the sidewalk, several people then came out of the party, shoved Plaintiff, punched him numerous times in the back of the head, and called him racial slurs.

99.     After being stalked, harassed, threatened, and physically assaulted by Roe's friends in Fall of 2017, Plaintiff avoided Roe for the rest of the semester, and the two did not speak when the Spring semester began in January 2018.

26

**B.  Hofstra Initiates Title IX Proceedings and Ignores Plaintiff's
     Pleas for Help.**

100.    On the morning of February 14, 2018—nearly <u>five months</u> after Plaintiff and Roe
had kissed in her room—Plaintiff was sitting in class when he received a text message from
Defendant O'Malley, Hofstra's Assistant Director of Public Safety, stating she "need[ed] to meet"
with Plaintiff and that he should come to Public Safety as soon as his class was over.  As Plaintiff
was in the middle of class, he did not initially respond to the message.  Within approximately
twenty minutes, O'Malley then called Plaintiff on his cell phone to insist he come to Public Safety
immediately; however, she refused to disclose the reason for the meeting.  Plaintiff complied and
went to the Public Safety office.  When he arrived, he was met by Defendant O'Malley as well as
Defendant McDonald, another Public Safety officer.

101.    Defendants O'Malley and McDonald then asked Plaintiff what happened between
him and Roe on September 16, 2017.   Defendants did not inform Plaintiff of the reason for this
inquiry, nor that a Title IX complaint had been filed, nor what the specific allegations against him
were.   Defendants did not inform Plaintiff of his rights under Title IX nor Hofstra's applicable
policies.

102.    As the interview began to feel like an interrogation, Plaintiff asked whether he
could have an advisor present.  Defendants O'Malley and McDonald told Plaintiff "why would
you need an advisor?" and "no, we need to do this now."  Plaintiff was extremely uncomfortable
with the interrogation and did not feel that it was in his best interest to discuss what had happened
between himself and Roe without an advisor present.

103.    Defendants O'Malley and McDonald then pressured Plaintiff to submit a written
statement, on the spot, regarding what happened between he and Roe on September 16, 2017.
Plaintiff was uncomfortable with this demand, and requested that he be permitted to leave and

27

submit it later that evening, as he had to go to wrestling practice.  O'Malley and McDonald reluctantly acquiesced.  They then had Plaintiff sign a No-Contact Order ("NCO"), prohibiting him from having any contact with Roe, and vice-versa.  They did not provide him any copy of Hofstra's applicable Title IX policies, nor did they advise him that he could have an advisor present when he returned.

104.    At approximately 9:45 a.m. the next day, Defendant O'Malley texted Plaintiff, chastising him for not returning the written statement after wrestling practice the prior evening, and asking him to come in that day to submit his statement.  Again, O'Malley made no mention of Plaintiff's right to have an advisor.  Plaintiff wrote a brief statement and submitted it to the Public Safety office that day.  While he was there, O'Malley told Plaintiff that he should add more details to his statement, as Roe's statement was "very detailed."  However, she made no mention of what exactly Roe had alleged.

105.    On information and belief, Roe had initially reported the incident to Public Safety during the Fall of 2017, but had declined to move forward with an investigation at that time.  Curiously, the timing of her decision to formalize her complaint in February was just before the six-month deadline for pursuing claims under Hofstra's policy at the time.  On information and belief, Hofstra's Pubic Safety office may have encouraged Roe to pursue a formal complaint before the deadline expired.[3]

106.    A few days later, Plaintiff was contacted by Defendant Vernace, Hofstra's Title IX officer for Student Issues, to set up a meeting for a procedural review of Hofstra's Title IX process. The meeting took place on or about February 27, 2018.

---

[3]  Hofstra's Public Safety Office took similar actions in the *Hall* case, falsely telling the female complainant that the male respondent had appealed a no-contact order, which then prompted the complainant to proceed with a formal process.

107.    By this time, Plaintiff's parents had hired the undersigned firm, Nesenoff &
Miltenberg, to assist him through the Title IX process.  As such, a non-attorney employee of the
firm accompanied Plaintiff to this meeting as his advisor, pursuant to his rights under New York
Education Law § 6444(5) as well as the Hofstra University Student Handbook.

108.    At the meeting with Vernace, Plaintiff was informed that Hofstra's Public Safety
office had <u>completed</u> a Title IX investigation relating to the September 16, 2017 incident.  At that
time, Plaintiff still had yet to be informed of the charges or precise allegations against him.

109.    At the meeting, Plaintiff told Vernace about the stalking, racial discrimination,
harassment, threats, and assault that he had been subjected to as a result of Roe's actions.  On
information and belief, Vernace expressed no real concern for Plaintiff's safety or well-being, and
simply told him to report the issue to Public Safety.

110.    On or about February 28, 2018, the day after Plaintiff met with Vernace, Plaintiff
was sent a formal Notice of Charges (Notice) stating that he was being charged with two counts
of Sexual Assault in violation of Hofstra's Student Policy Prohibiting Discriminatory Harassment,
Relationship Violence and Sexual Misconduct ("the Policy").  Specifically, Plaintiff was charged
with Non-Consensual Sexual Intercourse and Non-Consensual Sexual Contact, for allegedly
fondling Roe's buttocks and digitally penetrating her vagina without her Affirmative Consent, "as
set forth in the documents in the case file."  This Notice, issued by Defendant DePierro <u>after the
close of the investigation</u>, was the <u>first time</u> Plaintiff was informed of the precise allegations
against him.

111.    The Notice made no mention of the potential sanctions Plaintiff could face if he
was found responsible for the charges.  It did, however, require Plaintiff to schedule an

appointment to meet with DePierro within four days, or else he would be subject to a $100 fine for "failure to comply."

112.    On March 8, 2018, Plaintiff and his advisor then met with Defendant DePierro. DePierro explained to Plaintiff that he was going to have a disciplinary hearing based upon the charges in the Notice, and went over the hearing procedures.  At this meeting, Plaintiff again raised the issue of the stalking, threats, harassment, racial discrimination, and physical abuse he had suffered as a result of Roe's actions.  Again, Plaintiff was simply told to report it to Public Safety.

113.    On March 9, 2018, Plaintiff sent an email to Defendant O'Malley reporting the stalking, threats, harassment, and abuse he had suffered as a result of Roe's actions.  He detailed being beaten and called racial slurs in connection with being ejected from the party.  That same day, Plaintiff sent a follow-up email containing screenshots of the social media messages he had received from Roe's friend demanding his phone number.

114.    On March 27, 2018, Plaintiff's advisor emailed Defendant O'Malley on Plaintiff's behalf, to request a status update on Plaintiff's report of stalking, harassment, threats, and assault. In a curt response to both the advisor and Plaintiff, O'Malley refused to provide any information and told Plaintiff to check his university email.  O'Malley did not indicate why or what was in the email, and did not otherwise indicate that she was addressing his complaint or ask if he needed assistance.  No one from Hofstra ever followed up on Plaintiff's complaint after this email.

115.    On March 19, 2018, Plaintiff received a Notice of Hearing (NOH) from Defendant DePierro.  The NOH stated that Plaintiff could submit a list of proposed witnesses for the hearing, but only if the witnesses were initially disclosed to Public Safety during the investigation.  Being as Plaintiff was not even advised of Hofstra's Title IX procedures until after the investigation was completed, Plaintiff clearly was not able to submit witnesses and was therefore precluded from

30

proposing any witnesses for the hearing.  The NOH contained no information on who would comprise the Administrative Board for his Title IX hearing.

116.    On April 4, 2018, counsel for Plaintiff wrote to DePierro requesting some basic information about the hearing process, including the names of the Administrative Board members who would be overseeing Plaintiff's hearing.  DePierro responded that the Administrative Board members would not be identified until the start of the hearing itself.  DePierro then spuriously advised Plaintiff that he could request removal of a board member at that time, if he believed there to be a conflict of interest, but that he would have to be prepared to substantiate this claim.  Plainly, it would be impossible for Plaintiff to obtain evidence of a conflict of interest if Hofstra would not disclose the identities of the board members beforehand.

117.    On April 9, Plaintiff was permitted to review the "investigative file" for Roe's complaint.  Conspicuously absent from this file was any indication of a genuine investigation, let alone a "thorough" one.

118.    The file consisted of: (i) a one-paragraph written statement by Roe, which was not signed or dated by Roe, stating that Plaintiff followed Roe back to her room from the student center, that he "made" her get on top of him and then digitally penetrated her as she told him to stop, and that he continued to do so for over an hour while she continually protested; (ii) a one-paragraph statement by a friend of Roe's ("Witness 1"), dated February 14, 2018, stating that Roe called Witness 1 three times between noon and 2:00pm on September 16, 2017, and told Witness 1 that Plaintiff attempted to have sex with her multiple times, that he "held her down" and digitally penetrated her, but that she was too frozen to say stop, and just lay there silently, and that he stopped after a few minutes; (iii) medical records from the Hofstra University Wellness Center referring to a gynecological exam of Roe from September 18, 2017, which noted no abrasions,

31

fissures, abnormalities, bruising, or any other physical signs of assault; (iv) Plaintiff's written statement to Public Safety; (v) interview notes from Public Safety referring to Plaintiff's February 14, 2018 interview; (vi) a copy of the No Contact Order; and (vii) student access card swipe records showing that Plaintiff and Roe were in Roe's room from approximately 2:30 p.m. to 3:15 p.m, and that Plaintiff swiped back into his dorm at approximately 3:45 p.m.

119.    Thus, the entire "investigative file" contained no interview notes from any interviews with Roe or Witness 1, and indicated that no investigation whatsoever was made into the considerable discrepancies between Roe and her witnesses' recounting of events, nor Witness 1's impossible timeline, which was directly contradicted by the swipe card records.  On information and belief, Public Safety never even bothered to ask Roe or Witness 1 for their phone records from the day in question, which could have easily confirmed or denied Witness 1's claims.

120.    On April 17, 2018, Plaintiff had a disciplinary hearing before a three-member Administrative Board.  The only witnesses called at the hearing were Defendant O'Malley and Witness 1.  Roe testified as well.

121.    Witness 1 testified that Roe called him three times between noon and 2:00 p.m. on the afternoon of September 16, 2017.  He stated that he went to her room later that evening, wherein she told him about the assault.  He stated that Roe told him about the encounter "in detail," but could not recall any details at the hearing, other than that Plaintiff physically held Roe down. He testified that the reason Roe walked Plaintiff back to his dorm afterwards was because Roe "loves to be a good hostess" and that it was her "duty as the hostess" to accompany Plaintiff back to his dorm.

122.    Notably, Witness 1's timeline was completely belied by the swipe card records, which showed Plaintiff and Roe were together until approximately 3:45 p.m.  No one on the

Administrative Board questioned Witness 1 as to this inconsistency.  Similarly, no inquiry was made into the fact that Witness 1 claimed Roe told him Plaintiff "held her down" and attempted to have sex with her, and that she was too frozen to speak, whereas Roe never mentioned sexual intercourse, admitted that she was on top of Plaintiff, and initially told Public Safety that she said "stop" numerous times.

123.    When O'Malley served as a witness, Plaintiff asked her questions about the extent of Public Safety's investigation regarding Roe's claims.  O'Malley acknowledged there were no interview notes in the file for Roe or Witness 1, and refused to give a direct answer as to whether she even conducted an interview of Roe or Witness 1, instead giving the cagey response, "a written statement was provided."

124.    O'Malley also admitted that Public Safety never asked Witness 1 or Roe to provide phone records of the alleged phone calls from Roe to Witness 1.  O'Malley also admitted that she did not investigate Plaintiff's complaints of harassment, threats, and assault, despite Plaintiff and his advisor's multiple requests for her to do so.

125.    Roe testified at the hearing as well.  Roe claimed that she made several statements to Plaintiff such as "we shouldn't be doing this, I have a boyfriend."  She stated that later on, Plaintiff tried to pull down her pants, and she said "stop" and pulled them back up.  She made no mention of any digital penetration or attempted intercourse.  Roe also admitted that in September 2018, she told a member of the fraternity where Plaintiff was assaulted in October 2018 that Plaintiff had sexually assaulted her.

126.    It was only after Roe gave her story that an Administrative Board member asked her specifically whether Plaintiff digitally penetrated her.  She then said that he did.

127.     None of the Administrative Board members questioned the discrepancy between Roe and Witness 1's testimony, nor the discrepancy between their written statements and their hearing testimony.

128.     On April 18, 2018, Plaintiff received a Notice of Finding from DePierro indicating the Administrative Board found Plaintiff guilty of both charges of sexual assault.  The "fact-finding" portion of the notice was simply a copy/paste of the two sentence allegations against Plaintiff from the Notice of Charges, with the phrase "the Board determined" at the beginning of each sentence.  The notice contained no rationale, explanation, credibility findings, weight of evidence, or anything remotely resembling a reasoned decision or independent fact-finding.  Much like the Notice of Charges, the Notice of Finding also failed to contain any information about the possible sanctions Plaintiff faced.

129.     According to Hofstra's Policy, "Affirmative Consent" is defined as "a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Affirmative Consent can be given by . . . actions, as long as those . . . actions create clear permission regarding willingness to engage in the sexual activity."  In the instant case, Roe invited Plaintiff to her room, got on top of Plaintiff, kissed him, and touched his body over his clothing.  These are clear indications by her actions that she wished to engage with Plaintiff.  To the extent that Roe mentioned her boyfriend while she was on top of Plaintiff and kissing him, Plaintiff did not understand that statement alone, in the context of the complete situation, to be an indication of non-consent.  If Roe did not want to continue at any time, all she had to do was get off of Plaintiff or say so.  When Roe did say "stop," Plaintiff stopped immediately.

130.     On May 2, 2018, Plaintiff received a Notice of Sanction from DePierro.  The Notice informed Plaintiff that he was being sanctioned with a <u>two-year suspension</u> and a concurrent

campus ban.  The Notice also contained extensive additional requirements should Plaintiff seek readmission at the close of his suspension.  The Notice contained no explanation whatsoever as to the range of potential sanctions, or the rationale for the selection/imposition of this sanction in particular.

131.    In light of the facts of this particular case, the issuance of a <u>two-year suspension</u>, all because Plaintiff failed to understand Roe's initial vague and ambivalent statement about her boyfriend, is preposterous and unduly harsh, especially considering the lack of any real investigation and the considerable discrepancies in Roe and Witness 1's various statements.

132.    On May 9, 2018, Plaintiff submitted an appeal of the Finding and Sanction.  In the appeal, Plaintiff raised the issues of: his lack of proper notice of the charges before the investigation; O'Malley and McDonald's denial of an advisor during his Public Safety interview; the lack of any real investigation; the complete absence of any corroborating evidence of Roe's claims; the failure of Public Safety or the Board to probe the inconsistencies with Roe and Witness 1's statements; and the absence of any meaningful rationale or fact-finding in the decisional process.  Plaintiff also raised, once again, his concerns that no one at Hofstra responded to his documented reports of stalking, harassment, threats, and abuse resulting from Roe's actions.

133.    On June 11, 2018, Plaintiff's appeal was summarily denied by Sofia B. Pertuz, Assistant Vice President of Student Affairs.  With respect to Hofstra's failure to respond to Plaintiff's reports of harassment, Pertuz claimed that Public Safety had sent him a singular email on March 14, 2018, and it was therefore Plaintiff's fault for not responding to that email.  Once again, there was no indication as to what was even in the email, and no attempt to address Plaintiff's complaint moving forward.  Apparently, Hofstra considered the matter closed upon the

sending of a single email, despite Plaintiff's <u>numerous</u> subsequent requests for assistance and follow-up.

134.    On June 15, 2018, Plaintiff submitted a final appeal of the Finding and Sanction to W. Houston Dougherty, Vice President for Student Affairs.  Plaintiff again raised the issues of Hofstra's procedural violations, lack of substantive investigation, absence of rationale or explanations in the decision-making process, and Hofstra's continued, deliberate indifference to his reports of stalking, threats, harassment, and assault.  On July 13, 2018, Plaintiff's final appeal was summarily denied.  Again, there was no rationale provided; the letter simply stated "I do not find your procedural rights were violated" and "I do not find there was any failure to . . . respond to complaints of discrimination or retaliation."

135.    Plaintiff has exhausted all avenues for appeal under Hofstra's Policy.

## III. DEFENDANTS BREACHED THEIR CONTRACTUAL AND LEGAL OBLIGATIONS AND DUTY OF CARE OWED TO PLAINTIFF.

### A.  <u>Hofstra's Policies and Contract with Plaintiff.</u>

136.    Upon Plaintiff's acceptance into Hofstra, Hofstra provided Plaintiff with a copy of the Hofstra University "Guide to Pride" 2017-2018 academic year Student Handbook ("the Handbook"), which contains Hofstra's various policies on student conduct, discipline, and students' rights and responsibilities.  The Handbook also contains the Student Policy Prohibiting Discriminatory Harassment, Relationship Violence and Sexual Misconduct ("the Policy"), which is the applicable policy for Hofstra's Title IX procedures.

137.    On information and belief, the Handbook is updated and/or reissued each new school year.

138.    On information and belief, the Handbook and/or the various policies contained therein, are also available online on the Hofstra university website.

139.    The Handbook constitutes and represents a contract between students and the University and, in particular, between Plaintiff John Doe and Defendant Hofstra University.

140.    Throughout the Title IX process in this case, Defendants breached their contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policy and the other processes outlined in the Student Handbook.

141.    According to the Policy, a respondent in a Title IX proceeding has "the right to be accompanied by an advisor of choice who may assist and advise the student throughout the conduct process under this Policy, including during all meetings and hearings relating to the process." Student Handbook at 50 (emphasis added).

   a.    Defendants violated the Policy by: (i) failing to inform Plaintiff, before he was summoned to the Public Safety Office, of his right to have an advisor present; and (ii) denying Plaintiff access to an advisor during the February 14, 2018 Public Safety interview, wherein Plaintiff specifically and expressly asked about his right to an advisor, and was told "why would you need an advisor" and "no, we need to do this now."

142.    The Policy provides that "investigations of Complaints will be prompt, thorough, and impartial." Student Handbook at 51 (emphasis added).

   a.    Defendants violated the Policy because they failed to conduct any investigation at all.  Indeed, at the hearing, Defendant O'Malley acknowledged there were no interview notes in the investigative file and refused to directly answer whether she had ever even interviewed Roe or Witness 1.  She also admitted that Public Safety made no attempt to gather relevant evidence that directly reflected on the credibility of Roe and Witness 1's story regarding Roe's alleged phone calls.

143.    The Policy provides that the Notice of Charges "will contain the specific type of violation with which the respondent is charged, and the date, time, location, and factual allegations concerning the manner of the violation, <u>as well as possible sanctions for the violation</u>."  Student Handbook at 52 (emphasis added).

      a.   Defendants violated the Policy because the Notice of Charges sent to Plaintiff contained no information about potential sanctions.

144.    The Policy provides that "[u]pon being notified of the members of the board and the Hearing Officer, the parties have the right to request the removal of a member of the board or the Hearing Officer if a conflict of interest exists.   The request must be made to the Dean of Students or designee, and the party must be prepared to substantiate this contention."  Student Handbook at 53.

      a.   Defendants violated the Policy and acted in bad faith by failing and refusing to disclose the identities of the Administrative Board members before the date of the hearing.  Plainly, Plaintiff could not request removal to the Dean or substantiate any potential conflict if he was not notified of the board members until the hearing was already underway.

145.    The Policy provides that the Notice of Finding will contain "the findings of fact supporting the decision, and the rationale for the decision."  Student Handbook at 55.

      a.   Defendants violated the Policy because the Notice of Finding contained no findings of fact or any rationale for the decision; there was no discussion of evidence, credibility determinations, or anything other than a summary conclusion based on a predetermined outcome.

146.     The Policy provides that, in assessing the appropriate sanction, the University shall consider "(a) any record of past violations, (b) the nature and severity of such past violations, and (c) premeditation/intent to commit a violation," as well as "whether the sanction will (a) bring an end to the violation in question, (b) reasonably prevent a recurrence of a similar violation, and (c) remedy the effects of the violation on the complainant and the University community."  Student Handbook at 55.

      a.   Defendants violated this Policy because the sanction of a two-year suspension clearly failed to take into account that: (i) Plaintiff had no history of any past violations; (ii) Plaintiff had no intent or premeditation, and in fact, Roe herself acknowledged that Plaintiff had no intent or premeditation; (iii) the suspension was not necessary to end the violation in question, as Plaintiff had no contact with Roe since September of 2017; and (iv) to the extent Roe felt she did not want to be near Plaintiff again, a simple continuation of the No-Contact order could have equally remedied the effects of the alleged violation.

147.     The Policy provides that "where sanctions are imposed, the students will be notified of the rationale for the sanction."  Student Handbook at 55.

      a.   Defendants violated the Policy because the Notice of Sanction contained no rationale or explanation of any kind for the sanction imposed.

148.     The Policy provides that a Finding and Sanction may be set aside on appeal if: (i) the respondent's procedural rights have been violated; or (ii) the severity of the sanction is inappropriate given the details of the case.  *See* Student Handbook at 56.

      a.   Defendants violated the Policy because Defendants summarily denied both of Plaintiff's appeals despite the overwhelming evidence that (i) Plaintiff's procedural

rights were violated and (ii) the sanction of a two-year suspension for what was essentially a misunderstanding of an ambiguous moment was clearly inappropriate and disproportionate to the needs of the case.

149.    The Student Handbook defines "Harassment" as "[p]hysically or emotionally threatening or taunting another person, or bullying another person, whether these actions are taken in-person, electronically, or by any other means" and/or "[e]ngaging in a course of conduct  or repeatedly committing acts that alarm . . . such other person(s)."  Student Handbook at 32.

150.    According to the Student Handbook, Hofstra is committed to "ensuring that no individuals are subjected to . . . discriminatory harassment."  Student Handbook at 41.

151.    The Student Handbook further defines discriminatory harassment as "epithets because of an individual's . . . race."  Student Handbook at 42.

152.    The Student Handbook directs students experiencing discriminatory harassment to the Title IX officer for Student Issues (Defendant Vernace).  It also states that "the Title IX Officer for Student Issues is responsible for overseeing the University's response to reports and complaints by students" under the Policy.

   a.    In the instant case, Plaintiff properly reported the harassment and threats he had experienced to Defendant Vernace, pursuant to the Policy.  Defendant Vernace took no action to address Plaintiff's repeated complaints of stalking, threats, and racially-discriminatory harassment, including racial epithets, despite her obligations under the Policy.

153.    The Policy provides that "Each reporting individual will have the right to request that charges be filed against the accused in disciplinary proceedings."  Student Handbook at 50.

a.  Defendants violated the Policy by refusing to respond to Plaintiff's numerous requests to file charges against Roe and/or Roe's friends for threats, stalking, racially discriminatory harassment, and assault in violation of the Student Code of Conduct and the Policy.

**B.  New York State Education Law Article 129-B.**

154.    On July 7, 2015, New York State Governor Andrew Cuomo signed into law Education Law Article 129-B ("Art. 129-B"), commonly known as "Enough is Enough," which became effective on October 5, 2015. *See* N.Y. Educ. L. § 6438 *et seq*.

155.    Art. 129-B applies to "any college or university chartered by the regents or incorporated by special act of the legislature that maintains a campus in New York," including Hofstra University. *See* N.Y. Educ. Law 6439(1).  It mandates that all such institutions, including Hofstra, adopt certain rules and procedures in connection with their sexual misconduct policies.

156.    Art. 129-B mandates that each institution file with the State a certificate of compliance with the law, as well as a copy of all written rules and policies adopted in accordance with the statute.  If any institution fails to file a certificate of compliance, it will be ineligible to receive state aid or assistance until such time as it files the certificate.  Art. 129-B also requires the State to conduct random audits to ensure compliance with the provisions of the statute.

157.    In that regard, Art. 129-B sets forth a standard of care with which universities, including Hofstra, and their agents and representatives, must comply when addressing complaints of sexual assault and disciplinary proceedings related thereto.

158.    In the instant case, Hofstra and its agents and employees breached their duty of care to Plaintiff as an enrolled student subject to disciplinary proceedings governed by Art. 129–B.  As a result of this breach, Plaintiff suffered damages including loss of tuition payments, loss of education, and loss of future educational and career opportunities.

41

159.    Art. 129-B mandates that all New York State institutions of higher education, including Hofstra, "shall ensure" that every student be afforded the following rights:

a.  "The right to a process . . . that includes, at a minimum: (i) notice to a respondent describing the date, time, location and factual allegations concerning the violation, a reference to the specific code of conduct provisions alleged to have been violated, and possible sanctions"

b.  "[W]ritten notice of the findings of fact, the decision and the sanction, if any, as well as the rationale for the decision and sanction";

c.  "[T]he right . . . to be accompanied by an advisor of choice who may assist and advise . . . throughout the judicial or conduct process including during all meetings and hearings related to such process";

d.  "[A] prompt response to any complaint and to have the complaint investigated and adjudicated in an impartial, timely, and thorough manner";

e.  "[T]he right to a presumption that the respondent is 'not responsible' until a finding of responsibility is made pursuant to the provisions of this article";

f.   "[A]n investigation and process that is fair, impartial and provides a meaningful opportunity to be heard";

g.  "[W]ritten or electronic <u>notice, provided in advance . . . of any meeting they are required to or are eligible to attend</u>, of the specific rule, rules or laws alleged to have been violated and in what manner, and the sanction or sanctions that may be imposed on the respondent based upon the outcome of the judicial or conduct process";

h.  "[A] written statement detailing the factual findings supporting the determination and the rationale for the sanction imposed"; and

i.  "To be informed of the sanction or sanctions that may be imposed on the respondent based upon the outcome of the judicial or conduct process and the rationale for the actual sanction imposed."

j.  *See* N.Y. Educ. L. § 6444(5).

160.   Defendants violated all of these rights, as guaranteed by Article 129-B, by: (i) failing to provide Plaintiff written notice of the charges against him and the potential sanctions <u>before</u> his required meeting with Public Safety; (ii) failing to inform Plaintiff of his right to an advisor, and denying Plaintiff his right to an advisor at the required Public Safety meeting upon his request; (iii) failing to conduct a thorough and impartial investigation into Roe's claims against Plaintiff; (iv) failing to inform Plaintiff of the potential sanctions he faced in the Notice of Charges; (v) failing to afford Plaintiff the presumption of innocence; (vi) failing to provide written notice of findings of fact and any rationale for the finding of responsibility; (v) failing to inform Plaintiff of the potential sanctions he faced in the Notice of Finding; (vi) failing to provide any written notice of the rationale for the sanction imposed; (vii) failing to respond to Plaintiff's complaints of harassment and stalking; and (viii) failing to conduct a thorough and impartial investigation into Plaintiff's claims against Roe and her friends.

161.   Article 129-B also mandates that educational institutions "shall" adopt and implement a "Students' Bill of Rights," which must include, at minimum:

a.  The right to "[p]articipate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard";

43

b. The right to "[b]e protected from retaliation by the University, any student, . . . and/or their friends, family and acquaintances within the University's jurisdiction"; and

c. The right to "[b]e accompanied by an advisor of choice who may assist and advise a[n] . . . accused, or respondent throughout the judicial or conduct process including during all meetings and hearings related to such process."

d. *See* N.Y. Educ. L. § 6443.

162.    Hofstra's Student Handbook expressly incorporates the Students' Bill of Rights. Student Handbook at 58.

163.    Defendants breached their duty of care under the New York Education Law and their contractual obligations under the Hofstra Student Handbook by: (i) denying Plaintiff adequate notice of the allegations against him and the potential sanctions; (ii) denying Plaintiff a fair and impartial process; (iii) failing to protect Plaintiff from retaliation by Roe and her friends; and (iv) denying Plaintiff the aid of an advisor during a mandatory meeting related to the Title IX process, specifically, during his Public Safety interview in February 2018.

164.    As a reasonably foreseeable result of Defendants' breach of their duties under the New York Education Law, Plaintiff was improperly found Responsible for Sexual Assault, improperly and unjustifiably suspended from Hofstra, permanently stigmatized as a rapist and marred on his educational transcript/personnel file, denied the benefits of his enrollment and tuition payments at Hofstra, damaged in his future educational and career prospects, and subjected to harassment, threats, racial discrimination, and assault, creating a hostile learning environment.

## IV. PLAINTIFF'S DAMAGES.

165.     Due to Defendants' biased, unlawful, negligent and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication process which destroyed his reputation, precluded him from receiving the education he was promised by virtue of his enrollment at Hofstra, and will permanently impact his future education and career prospects.

166.     Due to Defendants' biased, unlawful, negligent and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

167.     Due to Defendants' biased, unlawful, negligent and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault.

168.     Due to Defendants' biased, unlawful, negligent, and improper conduct, Plaintiff's academic file and transcript are now marred by a false and baseless finding of sexual assault and a suspension.

169.     Due to Defendants' biased, unlawful, negligent and improper conduct, Plaintiff has suffered and will continue to suffer mental pain and anguish, emotional distress, ridicule, fear, persecution, and deprivation of his education and damage to his future educational and career prospects.

170.     Due to Defendants' negligent, reckless and deliberately indifferent conduct, Plaintiff was subjected to a hostile learning environment by virtue of severe and pervasive harassment, including stalking, threats, racial slurs, and a physical assault, for which he repeatedly sought help from Hofstra and which Hofstra repeatedly ignored and refused to remediate.

171.     Due to Defendants' negligent, reckless and deliberately indifferent conduct, Plaintiff was subjected to abuse, harassment and discrimination and deprived of his right to education and the benefits of enrollment at Hofstra.

## AS AND FOR A FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972-
### Erroneous Outcome
### (Against Hofstra)

172.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

173.    Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

174.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Hofstra university.

175.    Title IX is enforceable through a private right of action.

176.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018) (emphasis added).

177.    The "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; Application of the procedure to complaints alleging harassment" and "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence." Dep't of Ed., Office for Civ. Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20 (emphasis added).

46

178.    To succeed on an erroneous outcome claim under Title IX, a plaintiff must demonstrate: (1) a flawed proceeding, which (2) led to an erroneous outcome; and (3) gender was a motivating factor behind the erroneous outcome.

179.    An erroneous outcome occurred in this case because Plaintiff was subjected to a blatantly flawed proceeding and erroneously found to be responsible for violating Hofstra's policies, and gender was a motivating factor behind this erroneous outcome.

180.    The proceedings were flawed and caused an erroneous outcome because, by way of example and not limitation:

  a.    Defendants failed to inform Plaintiff, before he was summoned to the Public Safety Office on February 14, 2018, of his right to have an advisor present;

  b.    Defendants denied Plaintiff access to an advisor during the February 14, 2018 Public Safety interview, wherein Plaintiff specifically and expressly asked about his right to an advisor;

  c.    Defendants failed to timely notify Plaintiff, in writing, of the specific allegations against him, the charges faced, and the potential sanctions if found responsible for those charges;

  d.    Defendants failed to conduct a thorough and impartial investigation, relying entirely on presumptions that the female complainant was truthful and credible and that the male respondent was guilty;

  e.    Defendants failed to notify Plaintiff, in the Notice of Charges, of the potential sanctions he faced;

  f.    Defendants refused to disclose the identities of the Administrative Board members in advance of the hearing, despite Plaintiff's express requests for such information;

    g.   Defendants failed to address the inconsistencies between Roe's claims, Witness 1's testimony, and the evidence, indicating a predetermined finding of guilt based upon Plaintiff's gender and status as a male accused;

    h.   Defendants failed to apply the presumption of innocence and failed to properly apply the preponderance of the evidence standard;

    i.   Defendants failed to include, in the Notice of Finding, any real findings of fact, credibility assessments, weighing of the evidence, reference to any evidence, or any rationale whatsoever for the decision of the Administrative Board;

    j.   Defendants imposed an unduly harsh and disproportionate sanction, motivated by Plaintiff's gender and the pressure on Hofstra to prosecute Title IX complaints, rather than on the actual facts and circumstances of the case; and

    k.   Defendants did not provide any rationale for the imposition of the sanction, nor for the summary denial of Plaintiff's appeals.

181.    Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous findings and the decision to impose unduly harsh discipline upon Plaintiff.  These circumstances include, by way of example and not limitation:

    a.   The pressure imposed by OCR's <u>third</u> investigation at Hofstra for its allegedly insufficient response to complaints of sexual harassment and assault, which, on information and belief, were all filed by or on behalf of female students against male respondents;

    b.   Internal pressure from the student body after years of criticizing Hofstra for its insufficient response to claims of sexual assault, and specifically, for its

"institutional misogyny" and insufficient prosecution and punishment of male students and faculty members;

c.  Defendants' insistence on interrogating Plaintiff, the male accused, without an advisor, while conducting no interview or questioning of the female complainant throughout the process;

d.  Defendants' refusal to conduct any genuine investigation, for example, failing to request phone records to verify that Roe did indeed call Witness 1 on the afternoon of September 16, 2017; and

e.  Defendants' swift and summary actions to hold Plaintiff responsible and punish him to the utmost, while completely and entirely refusing to address Roe's own violation of the Policy, including Plaintiff's repeated complaints of retaliation, stalking, threats, harassment, and assault.

f.  Defendants' history, pattern, and practice of violating male respondents' procedural rights during the disciplinary process;

g.  Defendants' history, pattern, and practice of encouraging female students to seek and pursue formal discipline against male respondents, while refusing to pursue male students' complaints of policy violations by female students; and

h.  Defendants' history, pattern, and practice of conducting partial and gender-biased investigations.

182.  On information and belief, Hofstra's mishandling of Roe's complaint was informed by internal institutional pressure as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds.

183.   Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

184.   This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

185.   As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Hofstra to: (i) reverse/vacate the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record and restore him as a student in good standing; (iii) remove any record of Plaintiff's finding/suspension from his transcript/educational file; (iv) permanently destroy any record of Jane Roe's complaint; and (v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

### AS AND FOR A SECOND CAUSE OF ACTION
**Violation of Title VI of the Civil Rights Act of 1964–Discrimination
(Against Hofstra, DePierro, O'Malley, and Vernace)**

186.   Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

187.   Title VI of the Civil Rights Act of 1964 states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

188.    Title VI is enforceable by a private right of action.  *See Barnes v. Gorman*, 536 U.S. 181 (2002).

189.    To allege a claim for hostile educational environment under Title VI, a plaintiff must plead: (i) the alleged harassment was so severe, pervasive, and objectively offensive that it deprived the plaintiff of access to the educational opportunities or benefits provided by the school; (ii) the plaintiff notified the funding recipient of the harassment; and (iii) the funding recipient was deliberately indifferent to the harassment.  *See TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 595 (S.D.N.Y. 2011).

190.    In the instant case, Plaintiff was stalked on social media, personally threatened, had his photograph disseminated along with information that, on information and belief, implicated Plaintiff as a rapist; was denied access to campus Greek life; and was harassed, called racial epithets, and physically assaulted by numerous students and friends of Roe. Collectively, these actions were severe, pervasive, and objectively offensive, and precluded Plaintiff from taking full advantage of campus life as he could not attend Greek life events, or even go about campus, without fear of persecution and discrimination, particularly after being told that his photograph had been distributed to numerous people.

191.    Plaintiff notified Hofstra of the afore-mentioned stalking, threats, harassment, and assault on numerous occasions, including at in-person meetings with Defendants Vernace and DePierro, via email with documentary evidence to Defendant O'Malley, and in numerous communications with Hofstra's administration throughout Plaintiff's Title IX appeals.

192.    According to the Hofstra Student Handbook, the Defendants to whom Plaintiff reported this discriminatory harassment, including Hofstra's Title IX officer for Student Issues and

51

the Assistant Director of Public Safety, were responsible for responding to reports of harassment and discrimination at Hofstra.

193.     Despite Plaintiff's numerous requests to Hofstra to address the stalking, threats, discriminatory harassment, and assault he reported, Hofstra repeatedly refused to take any substantive action, simply claiming that Plaintiff should have received an email in March of 2018 and it was therefore Plaintiff's fault for not responding to the email.  Even after Plaintiff made clear to Hofstra that he either did not receive or understand the import of the alleged single email, as indicated by his <u>numerous</u> subsequent requests to Hofstra to take some kind of remedial action, Hofstra evidently considered the matter closed and knowingly and deliberately refused to take any action to address Plaintiff's complaints, including refusing to even disclose the purpose or content of the alleged email.

194.     Notably, all Roe had to do in order for Hofstra to initiate formal charges against Plaintiff was to write a one-paragraph statement, about which she was never substantively interviewed or questioned.  On this untested allegation alone, Hofstra's Title IX officers, Public Safety, and administration all took part in prosecuting Plaintiff.  Yet, when Plaintiff submitted a written report alleging severe discrimination and retaliation by Roe and her friends, including documentary evidence supporting the allegations, Hofstra's response was essentially to send Plaintiff an email and take no real action whatsoever.  Hofstra's actions and inactions, and the wildly different ways in which it treated a white, female complainant versus a male, African-American and Puerto Rican complainant, show a deliberate indifference to Plaintiff's complaints of racial discrimination and a bias against minority students.

195.     As a direct and proximate result of Defendants' deliberate indifference, Plaintiff sustained damages, including, without limitation, emotional distress, psychological damages, the

loss of access to the full benefits of enrollment and student life at Hofstra, and other direct and consequential damages.

196.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Hofstra to investigate Plaintiff's complaint and take appropriate remedial measures.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Violation of New York State Human Rights Law**
**(Against Hofstra)**

197.    Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

198.    The New York State Human Rights Law § 296(4) provides "[i]t shall be an unlawful discriminatory practice for an education corporation or association . . . to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]" N.Y. Exec. L. § 296(4).

199.    Defendant Hofstra University is a private, non-sectarian, non-profit education corporation organized and operating under the laws of the State of New York and as such, is subject to the requirements of New York State Human Rights Law § 296(4).

200.    In the instant case, Hofstra was made aware of racially discriminatory harassment and assault committed against Plaintiff; specifically, Plaintiff reported to Hofstra that he had been shoved, punched, and called racial slurs by several other Hofstra students.

201.    Plaintiff notified Hofstra of the aforementioned harassment on numerous occasions, including at in-person meetings with Defendants Vernace and DePierro, via email to Defendant

O'Malley, and in numerous communications with Hofstra's administration throughout Plaintiff's Title IX appeals.

202.    According to the Hofstra Student Handbook, the Defendants to whom Plaintiff reported this discriminatory harassment, including Hofstra's Title IX officer for Student Issues and the Assistant Director of Public Safety, were responsible for responding to reports of harassment and discrimination at Hofstra.

203.    Despite Plaintiff's numerous requests to Hofstra to address the discriminatory harassment and assault he reported, Hofstra repeatedly refused to take any substantive action, simply claiming that Plaintiff should have received an email in March of 2018 and it was therefore Plaintiff's fault for not responding to the email.  Even after Plaintiff made clear to Hofstra that he either did not receive or understand the import of the alleged single email, as indicated by his numerous subsequent requests to Hofstra to take some kind of remedial action, Hofstra evidently considered the matter closed and knowingly and deliberately refused to take any action to address Plaintiff's complaints, including refusing to even disclose the purpose or content of the alleged email.   In that regard, Hofstra's actions were irrational, unreasonable, and in bad faith.

204.    Hofstra knew or should have known of the harassment Plaintiff was subjected to and, by repeatedly refusing to address Plaintiff's claims, Hofstra condoned, acquiesced, and permitted Plaintiff to be harassed based upon his race, in violation of New York State Human Rights Law § 296(4).

205.    As a direct and proximate result of Defendants' conduct, Plaintiff sustained damages, including, without limitation, emotional distress, psychological damages, the loss of access to the full benefits of enrollment and student life at Hofstra, and other direct and consequential damages.

206.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Violation of New York State Civil Rights Law**
**(Against all Defendants)**

207.     Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

208.     Section 40–c of the New York State Civil Rights Law provides that "[n]o person shall, because of race, . . . [or] sex, . . . be subjected to any discrimination in his or her civil rights, or to any harassment, . . . in the exercise thereof[.]" N.Y. Civ. Rights L. § 40–c(2).

209.     In accordance with New York law, the pursuit of education is "recognized and declared to be a civil right."  N.Y. Exec. L. § 291(2).

210.     As detailed in Plaintiff's First Cause of Action for violation of Title IX, Defendants unlawfully discriminated against Plaintiff on the basis of his gender, and as a result, suspended him, denying Plaintiff his right to pursue his education as an enrolled student at Hofstra.

211.     As detailed in Plaintiff's Second and Third Causes of Action, Defendants knowingly and deliberately permitted Plaintiff to be harassed on the basis of his race, substantially interfering with his ability to pursue his education and enjoy all the benefits of being an enrolled student at Hofstra.

212.     Defendants discriminated against Plaintiff on the basis of his race and gender, by refusing to address the complaint made by Plaintiff, an African-American and Puerto Rican male student, while aggressively prosecuting the complaint made by Jane Roe, a white female student. Notably, both Plaintiff and Roe made allegations regarding an assault; Plaintiff's allegations

included stalking and threats as well.  Yet, Roe's complaint was taken seriously while Plaintiff's complaint was repeatedly and callously ignored.

213.    Based on the foregoing facts and circumstances, Defendants engaged in unlawful discriminatory practices in violation of New York State Civil Rights Law § 40–c(2).

214.    As a direct and proximate result of Defendants' conduct, Plaintiff sustained substantial injury, damage, and loss, including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

215.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Breach of Contract**
**(Against Hofstra)**

216.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

217.    At all times relevant hereto, a contractual relationship existed between Hofstra and Plaintiff by virtue of Plaintiff's enrollment at Hofstra and as defined by and through Hofstra's policies and procedures governing the student disciplinary system, including but not limited to the Policy.

218.    Through the documents it publishes and provides to students, Hofstra makes express contractual commitments to students involved in the disciplinary process and/or the reporting of potential violations of the student code of conduct.

219.     New York law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of the Student Handbook become part of that contract. *See Vought v. Teachers Coll., Columbia Univ.*, 511 N.Y.S.2d 880, 881 (App. Div. 1987).

220.     Implied in every contract is the covenant of good faith and fair dealing.  *See Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1917).

221.     Based on the aforementioned facts and circumstances, Hofstra created express and implied contracts when it offered, and Plaintiff accepted, admission to Hofstra, and when Plaintiff paid the required tuition and fees.

222.     Hofstra breached its agreement(s) with Plaintiff throughout the course of its investigation and adjudication of Jane Roe's complaint against Plaintiff.  By way of example, and not limitation:

a.   Hofstra failed to inform Plaintiff, before he was summoned to the Public Safety Office, of his right to have an advisor present, and denied Plaintiff access to an advisor during the February 14, 2018 Public Safety interview, in violation of the Policy provision permitting advisors at all meetings related to the Title IX process as well as the Students' Bill of Rights;

b.   Hofstra failed to adequately notify Plaintiff of the allegations against him, by failing to disclose such information until after the close of the investigation, in violation of the Students' Bill of Rights;

c.   Hofstra failed to conduct a substantive investigation, with Defendant O'Malley admitting she took no notes, asked no substantive questions of Roe or her witness, and failed to gather relevant evidence that could easily confirm or deny Roe's claim that she called Witness 1 immediately after her interaction with Plaintiff, in

violation of the Policy provision guaranteeing a "thorough" and "impartial" investigation;

d.  Hofstra failed to notify Plaintiff of the potential sanctions he faced, in violation of the Policy provision requiring the disclosure of such information in the Notice of Charges;

e.  Hofstra failed to include findings of fact or a rationale for the Administrative Board's decision, in violation of the Policy provision requiring the disclosure of such information in the Notice of Finding;

f.  Hofstra failed to apply the proper considerations to the sanction decision, and failed to supply the rationale for the sanction imposed, in violation of the Student Handbook provision requiring the consideration of certain enumerated factors, and the Policy provision requiring the disclosure of the rationale;

g.  Hofstra failed to protect Plaintiff from retaliation, harassment, discrimination, and assault, in violation of the express promises contained in the Student Handbook and the Students' Bill of Rights; and

h.  Hofstra failed to appropriately respond to Plaintiff's complaints of retaliation, harassment, discrimination, and assault, in violation of the express and implied promises in the Student Handbook and the Students' Bill of Rights.

223.    Taken together, Hofstra's actions and inactions constitute not only breach of the contract with Plaintiff, but also breach of the covenant of good faith and fair dealing implied in such contract(s).

224.    As a result of the direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, emotional distress, psychological

damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

225.    Plaintiff attempted to remediate these damages through his repeated pleas to Hofstra to address his complaints of discrimination and assault, as well as his numerous appeals to Hofstra to overturn the faulty Finding and undue Sanction.

226.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Hofstra to: (i) reverse/vacate the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record and restore him as a student in good standing; (iii) remove any record of Plaintiff's finding/suspension from his transcript/educational file; (iv) permanently destroy any record of Jane Roe's complaint; and (v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

**AND AS FOR A SIXTH CAUSE OF ACTION**
**Promissory Estoppel**
**(Against Hofstra)**

227.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

228.    Defendant Hofstra's policies and representations in its Student Handbook and other promotional materials constitute unambiguous representations and promises that Hofstra should have reasonably expected to induce action or forbearance on the part of Plaintiff.

229.    Hofstra proclaims on its website, "Hofstra University is committed to extending equal opportunity to all qualified individuals without regard to race, color, religion, sex, sexual orientation, gender identity or expression, age, national or ethnic origin, physical or mental

disability, marital or veteran status . . . in the conduct and operation of Hofstra University's educational programs and activities."

230.    Hofstra's website also proclaims that Hofstra complies with Title IX of the Education Amendments of 1972 and Title VI of the Civil Rights Act of 1964.

231.    Hofstra expected or should have expected Plaintiff to accept its offer of admission and financial aid, and choose not to attend other colleges based on its express and implied promises including, but not limited to: the opportunity to attain his educational objectives, to have his health, safety, welfare and human rights protected, to be free from discrimination, and to have complaints resolved impartially and promptly.

232.    Plaintiff reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by Hofstra, by choosing to attend Hofstra rather than other schools of equal caliber.

233.    These express and implied promises and representations made by Hofstra must be enforced to prevent substantial injustice to Plaintiff, including the unconscionable outcome of his two-year suspension and notation on his transcript, which will effectively preclude him from obtaining his undergraduate education and negatively impact his future career options.

234.    As a direct and proximate result of the above conduct, Plaintiff sustained substantial damages, including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

235.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Hofstra to: (i) reverse/vacate the findings and sanction

regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record and restore him as a student in good standing; (iii) remove any record of Plaintiff's finding/suspension from his transcript/educational file; (iv) permanently destroy any record of Jane Roe's complaint; and (v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

**AS AND FOR A SEVENTH CAUSE OF ACTION**

**Negligence**

**(Against O'Malley, McDonald, Vernace, and DePierro)**

236.     Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

237.     As school officials in charge of overseeing Plaintiff's education and safety at Hofstra, Defendants O'Malley, McDonald, Vernace, and DePierro owed Plaintiff a legal duty of care.

238.     As school officials in charge of overseeing and participating in the Title IX process at Hofstra, Defendants O'Malley, McDonald, Vernace, and DePierro are under a statutory duty, imposed by Title IX, to conduct a fair and impartial process.

239.     As school officials in charge of overseeing Plaintiff's education and safety, as well as the disciplinary process at Hofstra, Defendants O'Malley, McDonald, Vernace, and DePierro are under a statutory duty to comply with the standards set forth in Article 129-B of the New York Education Law.

240.     Defendants breached their duty of care to Plaintiff.  By way of example, and not limitation:

a. Defendants O'Malley and McDonald wrongfully and deliberately deprived Plaintiff of his right to have an advisor present during the Public Safety meeting in February 2018;

b. Defendants O'Malley and McDonald refused and failed to conduct a substantive, thorough, and impartial investigation into Roe's claims against Plaintiff, and failed to conduct a substantive, thorough, and impartial investigation into Plaintiff's claims against Roe and her friends;

c. Defendants O'Malley, Vernace and DePierro refused and failed to address Plaintiff's repeated pleas for help and reported harassment, threats, and assault;

d. Defendants Vernace and DePierro failed to provide Plaintiff with adequate, timely, written notice of the allegations against him, the potential charges/policy violations, and the potential sanctions he faced throughout the process;

e. Defendants Vernace and DePierro failed to provide Plaintiff with adequate notice of the findings of fact and rationale for the decision finding him responsible for sexual assault in violation of the Policy; and

f. Defendants Vernace and DePierro failed to provide Plaintiff with the rationale for the imposition of the sanction of a two-year suspension.

241. As a foreseeable, direct and proximate result of Defendants' negligence, Plaintiff was deprived of a fair and impartial process, wrongly found responsible for sexual assault, deprived of adequate notice and opportunity to be heard, improperly and unduly sanctioned to a two-year suspension and deprived of his education at Hofstra, and deprived of a fair opportunity to appeal the findings and sanction, as no rationale was provided for either decision.

242.   As a foreseeable, direct and proximate result of Defendants' negligence, Plaintiff sustained substantial injury, damage, and loss, including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

243.   As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

<u>**AS AND FOR AN EIGHTH CAUSE OF ACTION**</u>
**Negligence - Respondeat Superior**
**(Against Board of Trustees and Hofstra University)**

244.   Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

245.   As the employer for Defendants O'Malley, McDonald, Vernace and Depierro, Hofstra University is vicariously responsible for the negligent acts of its employees committed during the course of their employment.

246.   As the managing body for all operations of Hofstra University, the Board of Trustees is vicariously responsible for the negligent acts of Hofstra employees committed during the course of their employment.

247.   As detailed above, the fair and impartial investigation and adjudication of complaints of harassment and discrimination are part of the regular employment duties of Defendants O'Malley, McDonald, Vernace and DePierro.

248.   As detailed above, Defendants O'Malley, McDonald, Vernace and DePierro breached their duty of care to Plaintiff in the course of their employment and ordinary duties at Hofstra, specifically, with regard to their actions and inactions in investigating and adjudicating

an assault complaint against Plaintiff and failing and refusing to address Plaintiff's complaints of retaliation, stalking, harassment, discrimination, and assault by Roe and her friends.

249.    As detailed above, the foreseeable, direct and proximate result of Defendants' negligence was that Plaintiff sustained substantial injury, damage, and loss, including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

250.    As a result, Defendants Hofstra University and Board of Trustees are liable to Plaintiff for the negligent acts and omissions of Defendants O'Malley, McDonald, Vernace and DePierro under the principle of respondeat superior.

251.    Therefore, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against Defendants as follows:

i.    On the First Cause of Action for violation of Title IX of the Education Amendments of 1972, a judgment against Hofstra awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction directing Hofstra to: (i) reverse/vacate the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record and restore him as a student in good standing; (iii) remove any record of Plaintiff's finding/suspension from his transcript/educational file; (iv) permanently destroy any record of Jane Roe's complaint; and (v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

ii.    On the Second Cause of Action for violation of Title VII of the Civil Rights Act of 1964, a judgment against Hofstra awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction directing Hofstra investigate Plaintiff's complaint and take appropriate remedial measures;

iii.     On the Third Cause of Action for Violation of New York State Human Rights Law, a judgment against Hofstra awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

iv.     On the Fourth Cause of Action for Violation of New York State Civil Rights Law, a judgment against all Defendants awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

v.      On the Fifth Cause of Action for Breach of Contract, a judgment against Hofstra awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction directing Hofstra to: (i) reverse/vacate the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record and restore him as a student in good standing; (iii) remove any record of Plaintiff's finding/suspension from his transcript/educational file; (iv) permanently destroy any record of Jane Roe's complaint; and (v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

vi.     On the Sixth Cause of Action for Promissory Estoppel, a judgment against Hofstra awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction directing Hofstra to: (i) reverse/vacate the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record and restore him as a student in good standing; (iii) remove any record of Plaintiff's finding/suspension from his transcript/educational file; (iv) permanently destroy any record of Jane Roe's complaint; and (v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

vii.    On the Seventh Cause of Action for Negligence, a judgment against Defendants O'Malley, McDonald, Vernace and DePierro awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

viii.   On the Eighth Cause of Action for Negligence – Respondeat Superior, a judgment against Defendants Hofstra University and Board of Trustees awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

ix.     Injunctive relief, in the form of an order directing Hofstra to: (i) reverse/vacate the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record and restore him as a student in good standing; (iii) remove any record of Plaintiff's finding/suspension from his transcript/educational file; (iv) permanently destroy any record of Jane Roe's complaint; and (v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

x.      Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all issues so triable in this matter.

**Dated:   New York, New York**
**April 9, 2019**

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff*

By:/s/ Andrew T. Miltenberg
**Andrew T. Miltenberg, Esq.**
**Stuart Bernstein, Esq.**
**Adrienne Levy, Esq.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
alevy@nmllplaw.com

66